UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| TONY PROTOPAPPAS, | ) | |
| Petitioner, | ) | CASE NO. 2:07-cv-00901-RSL-JLW |
| v. | ) | |
| M. KRAMER, Warden, | ) | REPORT AND RECOMMENDATION |
| Respondent. | ) | |

I.    SUMMARY

Petitioner Tony Protopappas is currently incarcerated at the Folsom State Prison in Folsom, California.  He was convicted by a jury of three counts of second degree murder in Orange County Superior Court on July 31, 1984, and sentenced to three terms of 15-years-to-life with the possibility of parole, which he is serving concurrently.  He has filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 challenging the 2006 denial of parole by the Board of Parole Hearings of the State of California (the "Board").[1]  Respondent has filed an answer to the petition together with relevant portions of the state court record, and petitioner

---

[1]  The Board of Parole Hearings replaced the Board of Prison Terms, which was abolished on July 1, 2005.  *See* California Penal Code § 5075(a).

REPORT AND RECOMMENDATION -1

01 has filed a traverse in response to the answer.  The briefing is now complete and this matter is

02 ripe for review.  The Court, having thoroughly reviewed the record and briefing of the parties,

03 recommends the petition be denied and this action be dismissed with prejudice.

04      II.  BACKGROUND

05      Prior to the commission of the instant offenses, petitioner was licensed to practice as a

06 dentist and oral surgeon, which included the administration of general anesthesia.  (*See*

07 Docket 1 at 2, fn.1; *id*., Exhibit F at 3.)  Petitioner was operating his own dental practice in

08 Costa Mesa, California, when he killed three of his patients by administering lethal overdoses

09 of local and general anesthesia during various dental procedures.  (*See id*., Ex. F at 1-3.)  The

10 evidence at trial showed that petitioner knew his conduct endangered the life of each victim,

11 but he nevertheless acted with deliberate and conscious disregard for their safety.  (*See* Dkt.

12 10, Ex. 5 at 1.)  At the time of the murders, petitioner was also abusing alcohol, cocaine, and

13 opiates on a daily basis.  (*See* Dkt. 1, Ex. F at 3.)

14      Petitioner's Life Prisoner Evaluation report, which was prepared in September 2005,

15 set forth the following relevant facts:

16      "On September 30, 1982, Kim M. Andreassen went to the defendant's dental
        office for dental work and was placed under general anesthetic with a
17      combination of drugs.  Several times during the dental procedures, Ms.
        Andreassen's breathing was noted to be shallow, resulting in oxygen being
18      administered to her by the defendant.  Upon completion of the dental work,
        Ms. Andreassen began gasping for air.  Oxygen was administered; paramedics
19      arrived and found her in cardiac arrest.  She was transported to Hoag Hospital
        where she was pronounced dead on arrival.
20
        During the investigation it was revealed Ms. Andreassen was under doctor's
21      care and her personal physician had been contacted several days before her
        scheduled appointment and he advised that only a local anesthetic be
22      administered to her.  Reportedly, she insisted on a general anesthetic.  An

REPORT AND RECOMMENDATION -2

01    employee at the dental office told a police investigator when the defendant was
      told of [the] patient's insistence, he replied, "If I put her to sleep, that will be
02    her death for sure."

03    On February 8, 1983, Patricia M. Craven went to the defendant's office for
      dental work.  She was placed under general anesthetic through intravenous
04    administration of a combination of drugs.  Ms. Craven stopped breathing, but
      began breathing again after the defendant administered oxygen.

05
      Dr. Badea, an employee of the defendant[,] performed some dental work on
06    Ms. Craven over the next several hours, during this time additional anesthetics
      were administered to the patient several times.  When Dr. Badea finished her
07    dental work with Ms. Craven, she advised the defendant and he indicated that
      he would extract Ms. Craven's wisdom teeth.   Additional drugs were
08    administered to keep her unconscious.

09    Upon completion of the dental work, staff members were unable to awaken
      her.  The defendant administered Narcan to her to counteract the anesthetics.
10    One of the defendant's employees wheeled Ms. Craven to her mother's car.
      She was placed on the front seat of the vehicle.  Her mother, Mrs. Russ, drove
11    Ms. Craven to [their] residence.  A short time later Mrs. Russ observed her
      daughter's breathing became shallow and heard a gurgling noise in her throat.
12    Paramedics were summoned: they determined she was in cardiac arrest and
      transported her to Mission Community Hospital, where she died on February
13    19, 1983.

14    On February 11, 1983, Mrs. Cathryn Jones went to the defendant's office to
      have all her teeth removed.  She was placed under general anesthetic through
15    the use of intravenous injections of drugs.  A short time later, Mrs. Jones'
      fingernails were turning blue.  An assistant noticed the patient's condition, at
16    which time Protopappas became upset and said "this is what happens in this
      office all the time.  You don't know what is blue." The defendant administered
17    oxygen and injected Narcan into Mrs. Jones in an attempt to counteract the
      effects of the anesthetic.  When it was determined that Mrs. Jones had no
18    detectable pulse, paramedics were summoned and found her to be in cardiac
      arrest.  She was transported to Hoag Hospital, where she died on February 13,
19    1983."

20    (See Dkt. 1, Ex. F at 1-2.)

21          In an opinion published in part, the California Court of Appeal also set forth a

22    detailed description of petitioner's offenses, which petitioner asserts he "accepts" as

REPORT AND RECOMMENDATION -3

01   an accurate depiction of the facts.  (*See* Dkt. 1, Ex. A at 1-6; *id*., Ex. B at 60.)  The

02   California Court of Appeal summarized its factual findings as follows:

03
> "Petitioner did not supply proper general anesthesia or tailor the dosage to the patient.  Without the patient's authorization he substituted surrogate dentists

04
> who were neither licensed nor qualified to administer general anesthesia.  He instructed them to give improperly preset dosages for extended periods with

05
> little or no personal supervision and caused multiple patients to receive ever increasing amounts of general anesthesia at the same time, none of them

06
> enjoying his undivided attention.  He was also habitually slow in reacting to the resulting overdoses; and in the case of Craven, simply abandoned her."

07
*People v. Protopappas*, 201 Cal.App.3d 152, 171-72 (1988).

08

09       Petitioner was convicted by a jury of three counts of second degree murder based upon

10   a theory of "implied malice" in Orange County Superior Court on July 25, 1984.  (*See* Dkt. 1,

11   Ex. A; Dkt. 10, Ex. 1.)  Petitioner's minimum eligible parole date was set for October 22,

12   1993.  (*See* Dkt. 1, Ex. B at 1.)  The parole denial which is the subject of this petition took

13   place after a parole hearing held on January 19, 2006.  (*See id.*)  This was petitioner's fourth

14   parole consideration hearing.  (*See id.*, Ex. G.)  As of the date of the 2006 parole hearing,

15   petitioner was sixty-years-old, and had been in custody for approximately twenty-one years.

16   (*See id.*, Ex. G at 5.)

17       After denial of his 2006 application, petitioner filed habeas corpus petitions in the

18   Orange County Superior Court, California Court of Appeal, and California Supreme Court.

19   (*See* Dkt. 10, Exs. 5, 6 and 7.)  Those petitions were unsuccessful.  (*See id.*, Exs. 5, 6 and 7.)

20   This federal habeas petition followed.  Petitioner contends the 2006 denial by the Board

21   violated his Fifth and Fourteenth Amendment Due Process rights.  Thus, petitioner does not

22   challenge the validity of his conviction, but instead challenges the Board's 2006 decision

REPORT AND RECOMMENDATION -4

01 finding him unsuitable for parole.

02      III.     STANDARD OF REVIEW

03      The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this

04 petition because it was filed after the enactment of AEDPA.  *See Lindh v. Murphy*, 521 U.S.

05 320, 326-27 (1997).  Because petitioner is in custody of the California Department of

06 Corrections pursuant to a state court judgment, 28 U.S.C. § 2254 provides the exclusive

07 vehicle for his habeas petition.  *See White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir.), *cert.*

08 *denied*, 543 U.S. 991 (2004) (providing that § 2254 is "the exclusive vehicle for a habeas

09 petition by a state prisoner in custody pursuant to a state court judgment, even when the

10 petitioner is not challenging his underlying state court conviction."). Under AEDPA, a habeas

11 petition may not be granted with respect to any claim adjudicated on the merits in state court

12 unless petitioner demonstrates that the highest state court decision rejecting his petition was

13 either "contrary to, or involved an unreasonable application of, clearly established Federal

14 law, as determined by the Supreme Court of the United States," or "was based on an

15 unreasonable determination of the facts in light of the evidence presented in the State court

16 proceeding."  28 U.S.C. § 2254(d)(1) and (2).

17      As a threshold matter, this Court must ascertain whether relevant federal law was

18 "clearly established" at the time of the state court's decision.  To make this determination, the

19 Court may only consider the holdings, as opposed to dicta, of the United States Supreme

20 Court.  *See Williams v. Taylor*, 529 U.S. 362, 412 (2000).  In this context, Ninth Circuit

21 precedent remains persuasive but not binding authority.  *See id.* at 412-13; *Clark v. Murphy*,

22  331 F.3d 1062, 1069 (9th Cir. 2003).

REPORT AND RECOMMENDATION -5

01        The Court must then determine whether the state court's decision was "contrary to, or

02   involved an unreasonable application of, clearly established Federal law."  *See Lockyer v.*

03   *Andrade*, 538 U.S. 63, 71 (2003).  "Under the 'contrary to' clause, a federal habeas court may

04   grant the writ if the state court arrives at a conclusion opposite to that reached by [the

05   Supreme] Court on a question of law or if the state court decides a case differently than [the]

06   Court has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412-13.

07   "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

08   state court identifies the correct governing legal principle from [the] Court's decisions but

09   unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  At all

10   times, a federal habeas court must keep in mind that it "may not issue the writ simply because

11   [it] concludes in its independent judgment that the relevant state-court decision applied clearly

12   established federal law erroneously or incorrectly.  Rather that application must also be

13   [objectively] unreasonable."  *Id.* at 411.

14        In each case, the petitioner has the burden of establishing that the state court decision

15   was contrary to, or involved an unreasonable application of, clearly established federal law.

16   *See* 28 U.S.C. § 2254; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).  To determine

17   whether the petitioner has met this burden, a federal habeas court looks to the last reasoned

18   state court decision because subsequent unexplained orders upholding that judgment are

19   presumed to rest upon the same ground.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04

20   (1991); *Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007).

21        Finally, AEDPA requires federal courts to give considerable deference to state court

22   decisions, and state courts' factual findings are presumed correct.  *See* 28 U.S.C. § 2254(e)(1).

01    Federal courts are also bound by a state's interpretation of its own laws.  *See Murtishaw v.*

02    *Woodford*, 255 F.3d 926, 964 (9th Cir. 2001) (citing *Powell v. Ducharme,* 998 F.2d 710, 713

03    (9th Cir. 1993)).

04              IV.       FEDERAL HABEAS CHALLENGES TO STATE PAROLE DENIALS

05              A.       *Due Process Right to be Released on Parole*

06              Under the Fifth and Fourteenth Amendments to the United States Constitution, the

07    government is prohibited from depriving an inmate of life, liberty or property without the due

08    process of law.  U.S. Const. amends. V, XIV.  A prisoner's due process claim must be

09    analyzed in two steps: the first asks whether the state has interfered with a constitutionally

10    protected liberty or property interest of the prisoner, and the second asks whether the

11    procedures accompanying that interference were constitutionally sufficient.  *Ky. Dep't of*

12    *Corrs. v. Thompson*, 490 U.S. 454, 460 (1989); *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d

13    1123, 1127 (9th Cir. 2006).

14              Accordingly, our first inquiry is whether petitioner has a constitutionally protected

15    liberty interest in parole.  The Supreme Court articulated the governing rule in this area in

16    *Greenholtz v. Inmates of Neb. Penal,* 442 U.S. 1 (1979), and *Board of Pardons v. Allen,* 482

17    U.S. 369 (1987).  *See McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002) (applying

18    "the 'clearly established' framework of *Greenholtz* and *Allen*" to California's parole scheme).

19    The Court in *Greenholtz* determined that although there is no constitutional right to be

20    conditionally released on parole, if a state's statutory scheme employs mandatory language

21    that creates a presumption that parole release will be granted if certain designated findings are

22    made, the statute gives rise to a constitutional liberty interest.  *See Greenholtz*, 442 U.S. at 7,

REPORT AND RECOMMENDATION -7

01   12; *Allen*, 482 U.S. at 377-78.

02         As discussed *infra*, California statutes and regulations afford a prisoner serving an

03   indeterminate life sentence an expectation of parole unless, in the judgment of the parole

04   authority, he "will pose an unreasonable risk of danger to society if released from prison."

05   Title 15 Cal. Code Regs., § 2402(a).  The Ninth Circuit has therefore held that "California's

06   parole scheme gives rise to a cognizable liberty interest in release on parole."  *McQuillion*,

07   306 F.3d at 902.  To similar effect,  *Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007) held

08   that California Penal Code § 3041 vests all "prisoners whose sentences provide for the

09   possibility of parole with a constitutionally protected liberty interest in the receipt of a parole

10   release date, a liberty interest that is protected by the procedural safeguards of the Due

11   Process Clause."  This "liberty interest is created, not upon the grant of a parole date, but

12   upon the incarceration of the inmate."  *Biggs v. Terhune*, 334 F.3d 910, 915 (2003).  *See also*

13   *Sass*, 461 F.3d at 1127.

14         Because the Board's denial of parole interfered with petitioner's constitutionally-

15   protected liberty interest, this Court must proceed to the second step in the procedural due

16   process analysis and determine whether the procedures accompanying that interference were

17   constitutionally sufficient.  "[T]he Supreme Court [has] clearly established that a parole

18   board's decision deprives a prisoner of due process with respect to this interest if the board's

19   decision is not supported by 'some evidence in the record.'"  *Irons*, 505 F.3d at 851 (citing

20   *Superintendent v. Hill*, 472 U.S. 445, 457 (1985) (holding the "some evidence" standard

21   applies in prison disciplinary proceedings)).  The "some evidence" standard requires this

22   Court to determine "whether there is any evidence in the record that could support the

REPORT AND RECOMMENDATION -8

01    conclusion reached by the disciplinary board." *Hill*, 472 U.S. at 455-56.  Although *Hill*

02    involved the accumulation of good time credits rather than release on parole, later cases have

03    held that the same constitutional principles apply in the parole context because both situations

04    directly affect the duration of the prison term.  *See e.g., Jancsek v. Or. Bd. of Parole*, 833 F.2d

05    1389, 1390 (9th Cir. 1987) (adopting the "some evidence" standard set forth by the Supreme

06    Court in *Hill* in the parole context); *Sass*, 461 F.3d at 1128-29 (holding the same); *Biggs*, 334

07    F.3d at 915 (holding the same); *McQuillion*, 306 F.3d at 904 (holding the same).

08         "The fundamental fairness guaranteed by the Due Process Clause does not require

09    courts to set aside decisions of prison administrators that have some basis in fact," however.

10    *Hill*, 472 U.S. at 456.  Similarly, the "some evidence" standard is not an invitation to examine

11    the entire record, independently assess witnesses' credibility, or re-weigh the evidence.  *Id.* at

12    455.  Instead, it is there to ensure that an inmate's loss of parole was not arbitrarily imposed.

13    *See id.* at 454.  The Court in *Hill* added an exclamation point to the limited scope of federal

14    habeas review when it upheld the finding of the prison administrators despite the Court's

15    characterization of the supporting evidence as "meager."  *See id.* at 457.

16         B.    *California's Statutory and Regulatory Scheme*

17         In order to determine whether "some evidence" supported the Board's decision with

18    respect to petitioner, this Court must consider the California statutes and regulations that

19    govern the Board's decision-making.  *See Biggs*, 334 F.3d at 915.  Under California law, the

20    Board is authorized to set release dates and grant parole for inmates with indeterminate

21    sentences.  *See* Cal. Penal Code § 3040 and 5075, *et seq.*  Section 3041(a) requires the Board

22    to meet with each inmate one year before the expiration of his minimum sentence and

REPORT AND RECOMMENDATION -9

01 normally set a release date in a manner that will provide uniform terms for offenses of similar

02 gravity and magnitude with respect to their threat to the public, as well as comply with

03 applicable sentencing rules.  Subsection (b) of this section requires that the Board set a release

04 date "unless it determines that the gravity of current convicted offense or offenses, or the

05 timing and gravity of current or past convicted offense or offenses, is such that consideration

06 of the public safety requires a more lengthy period of incarceration." *Id.*, § 3041(b).  Pursuant

07 to the mandate of § 3041(a), the Board must "establish criteria for the setting of parole release

08 dates" which take into account the number of victims of the offense as well as other factors in

09 mitigation or aggravation of the crime.  The Board has therefore promulgated regulations

10 setting forth the guidelines it must follow when determining parole suitability.  *See* 15 CCR

11 § 2402, *et seq.*

12   Accordingly, the Board is guided by the following regulations in making a

13 determination whether a prisoner is suitable for parole:

14  (a) General. The panel shall first determine whether the life prisoner is suitable for
release on parole. Regardless of the length of time served, a life prisoner shall be
15 found unsuitable for and denied parole if in the judgment of the panel the prisoner will
pose an unreasonable risk of danger to society if released from prison.

16

17  (b) Information Considered. All relevant, reliable information available to the panel
shall be considered in determining suitability for parole. Such information shall
include the circumstances of the prisoner's social history; past and present mental
18 state; past criminal history, including involvement in other criminal misconduct which
is reliably documented; the base and other commitment offenses, including behavior
19 before, during and after the crime; past and present attitude toward the crime; any
conditions of treatment or control, including the use of special conditions under which
20 the prisoner may safely be released to the community; and any other information
which bears on the prisoner's suitability for release. Circumstances which taken alone
21 may not firmly establish unsuitability for parole may contribute to a pattern which
results in a finding of unsuitability.

22

REPORT AND RECOMMENDATION -10

01   15 CCR § 2402(a) and (b).  Subsections (c) and (d) also set forth suitability and unsuitability

02   factors to further assist the Board in analyzing whether an inmate should be granted parole,

03   although "the importance attached to any circumstance or combination of circumstances in a

04   particular case is left to the judgment of the panel." 15 CCR § 2402(c).

05          In examining its own statutory and regulatory framework, the California Supreme

06   Court in *In re Lawrence* recently held that the proper inquiry for a reviewing court is

07   "whether some evidence supports the *decision* of the Board … that the inmate constitutes a

08   current threat to public safety, and not merely whether some evidence confirms the existence

09   of certain factual findings." *Id.*, 44 Cal.4th 1181, 1212 (2008).  The court also asserted that

10   the Board's decision must demonstrate "an individualized consideration of the specified

11   criteria, but "[i]t is not the existence or nonexistence of suitability or unsuitability factors that

12   forms the crux of the parole decision; the significant circumstance is how those factors

13   interrelate to support a conclusion of current dangerousness to the public." *Id.* at 1204-05,

14   1212.  As long as the evidence underlying the Board's decision has "some indicia of

15   reliability," parole has not been arbitrarily denied.  *See Jancsek*, 833 F.2d at 1390.  As the

16   California courts have continually noted, the Board's discretion in parole release matters is

17   very broad.  *See Lawrence*, 44 Cal.4th at 1204.  Thus, the penal code, corresponding

18   regulations, and California law clearly establish that the fundamental consideration in parole

19   decisions is public safety and an assessment of a prisoner's current dangerousness.  *See id.*, at

20   1205-06.

21

22

01      C.      *Summary of Governing Principles*

02          By virtue of California law, petitioner has a constitutional liberty interest in release on

03  parole.  The parole authorities may decline to set a parole date only upon a finding that

04  petitioner's release would present an unreasonable present risk of danger to society if he is

05  released from prison.  Where the parole authorities deny release, based upon an adverse

06  finding on that issue, the role of a federal habeas court is narrowly limited.  It must deny relief

07  if there is "some evidence" in the record to support the parole authority's finding of present

08  dangerousness.  The penal code, corresponding regulations, and California law clearly support

09  this definition of the issues.

10      V.      PARTIES' CONTENTIONS

11          Petitioner contends that the Board violated his state and federal due process rights by

12  finding him unsuitable for parole without some evidence that he poses an unreasonable risk of

13  danger to society if released from prison.[2]  (*See* Dkt. 1 at 2 and 14-45.)  Petitioner also argues

14  that what he calls "the Dannenberg standard," as well as the "heinous, atrocious, and cruel"

15  standard set forth by the regulations in section 2402(c)(1), are unconstitutionally vague on

16  their face and as applied to him.  (*See id.* at 46-55.)  Finally, petitioner asserts that his First

17  and Fourteenth Amendment rights were violated when the Board denied him a parole date

18  because he refused to participate in state-sponsored religious self-help programs, such as

19  Alcoholics Anonymous ("AA") or Narcotics Anonymous ("NA").  (*See id.* at 55-60.)

20

21          [2] We do not reach petitioner's claim that his state due process rights were violated, as state claims are
not cognizable in a federal habeas petition. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (asserting that "it
22  is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

REPORT AND RECOMMENDATION -12

01        Respondent claims that petitioner does not have a constitutionally protected liberty

02   interest in being released on parole, that the "some evidence" standard is inapplicable in this

03   context, and that even if he does have a protected liberty interest, the Board adequately

04   predicated its denial of parole on "some evidence."  (*See* Dkt. 10 at 4-9.)  Accordingly,

05   respondent argues that petitioner's due process rights were not violated by the Board's 2006

06   decision, and the Orange County Superior Court's Order upholding the Board's 2006 parole

07   denial was not an unreasonable application of clearly established federal law.  (*See id*. at 9.)

08   Finally, respondent asserts that the Board did not mandate petitioner's participation in AA or

09   NA, and therefore petitioner's First and Fourteenth Amendments rights were not violated by

10   the Board's denial of a parole date.  (*See id*.)

11        VI.      ANALYSIS OF RECORD IN THIS CASE

12        A.      *State Court Proceedings*

13        Petitioner's habeas petitions filed in the California Court of Appeal and California

14   Supreme Court contained the same claims as his Orange County Superior Court petition, and

15   both petitions were summarily denied.  (*See* Dkt. 10, Exs. 5-7.)  The parties agree that

16   petitioner has properly exhausted his state court remedies, and timely filed the instant petition.

17   (*See* Dkt. 1 at 3; Dkt. 10 at 3.)  This Court reviews the Orange County Superior Court's Order

18   upholding the Board's decision to determine whether it meets the deferential AEDPA

19   standards, as it is the last reasoned state court decision.  *See Ylst*, 501 U.S. at 803-04.

20        In a reasoned decision denying petitioner's request for habeas relief, the Orange

21   County Superior Court asserted that based upon its review of the record, the Board adequately

22   considered all of the suitability and unsuitability factors required by law.  (*See* Dkt. 10, Ex. 5

REPORT AND RECOMMENDATION -13

01  at 3.)  The superior court noted, however, that the Board "found that the positive factors did

02  not outweigh the factors of unsuitability."  (*See id*.)  After summarizing the Board's findings,

03  the superior court concluded that "[t]he Board's determination of unsuitability was supported

04  by 'some evidence', and constitutes neither an abuse of discretion nor a denial of due

05  process."  (*See id*.)  In addition, the superior court found that "[p]etitioner's claim that the

06  Board may not continue to rely on the commitment offense is … without merit," because the

07  Board's findings "conform[ed] to the present state of the law."  (*See id*. at 4.)

08      Regarding petitioner's claim that the Board's self-help recommendation effectively

09  mandated his participation in a religiously-based program in violation of the First

10  Amendment, the superior court concluded that petitioner's contention was unsupported by the

11  record.  (*See id*.)  The superior court asserted, "First, the Board made clear that it did not

12  mandate NA or AA attendance.  Second, the record reflects that other types of programs are

13  available in prison.  While the Board noted that NA and AA are the most readily available

14  programs of this type, it stated that other programs are periodically made available to

15  inmates."  (*See id*.)  Finally, the superior court stated that petitioner's "failure to attend self-

16  help programs was only one of several reasons which the Board gave for its two-year denial.

17  Because the other reasons independently support the two-year denial, his First Amendment

18  claim, even if meritorious, would not change the result."  (*See id*.)

19      B.    *Petitioner's Due Process Claim*

20      The Board based its decision that petitioner was unsuitable for parole primarily upon

21  his three commitment offenses, but also cited his unstable social history, insufficient

22  participation in self-help programming, unfavorable psychological evaluation, and law

REPORT AND RECOMMENDATION -14

01  enforcement's continued opposition to petitioner's release on parole.  (*See* Dkt. 1, Ex. B at 69-

02  71.)  The Board's findings tracked the applicable unsuitability and suitability factors listed in

03  § 2402(b), (c) and (d) of title 15 of the California Code of Regulations.  After considering all

04  reliable evidence in the record, the Board concluded that evidence of petitioner's positive

05  behavior in prison did not outweigh evidence of his unsuitability for parole.  (*See id.* at 72.)

06          The Board primarily relied upon the circumstances of petitioner's three commitment

07  offenses to find petitioner unsuitable for parole.  (*See id.*, at 69.)  The Board found that

08  "multiple victims were killed in separate incidents," because petitioner killed three of his

09  female patients on different dates.  (*See id.*)  Specifically, he killed a twenty-three-year-old

10  woman, a thirty-one-year-old woman, and a thirteen-year-old girl.  (*See id.*)  In addition,

11  petitioner's "offenses were carried out in a manner which demonstrates an exceptionally

12  callous disregard for human suffering in that these victims were extremely vulnerable and

13  unsuspecting.  They had gone in for dental work and trusting themselves and their well being

14  to the inmate as a professional dentist and subsequently lost their lives when administered

15  faulty doses [of] anesthesia…."  (*See id.* at 69-70.)  *See also* 15 CCR § 2402(c)(1)(A) and (D).

16  The circumstances surrounding petitioner's three commitment offenses provides "some

17  evidence" to support the Board's conclusion that petitioner would present a danger to society

18  if released from prison.

19          The second unsuitability factor relied upon by the Board was petitioner's unstable

20  social history, including his long term abuse of narcotics and alcohol.  (*See* Dkt. 1, Ex. B at

21  23-24 and 70.)  The Board based its finding upon evidence in the record regarding petitioner's

22  abuse of alcohol, cocaine, and opiates, as well as his statements during the hearing.  (*See id.* at

01    23-24 and 70.)  Petitioner also admitted to the panel that he was abusing alcohol and narcotics

02    at the time of the commitment offense, which "contributed to [his] bad judgment.…"  (*See id*.

03    at 23-24.)  Because the Board could reasonably conclude that petitioner's long history of drug

04    and alcohol abuse could make him unpredictable and a threat to others, especially in light of

05    his failure to complete any kind of alcohol or drug treatment program in prison, the Board's

06    finding was supported by "some evidence" in the record.  (*See id*., at 84.)

07            The third factor relied upon by the Board to deny parole was petitioner's insufficient

08    participation in "beneficial self-help programs" in prison, including any kind of substance

09    abuse programming.  (*See id*. at 55 and 70.)  Although petitioner has been incarcerated for

10    over two decades, he has only participated in two self-help programs, and he completed both

11    programs in 2003.  (*See id*. at 54-55.)  Specifically, petitioner completed a personal growth

12    seminar and a seven-part video lecture series on dealing with conflict and confrontation.  (*See

13    id*.)  The Board noted that although several panels in the past have asked petitioner to

14    participate in additional self-help programs and substance abuse programs because of his long

15    history of "self-professed substance abuse," petitioner has declined to participate because

16    programs like AA or NA involve "substantial religious content" and "for some reason I can't

17    participate in something that has a – I don't like to be told how to practice my faith."  (*See id*.

18    at 49.)  Petitioner claims that he has "tried to do [his] own self realization type of program."

19    (*See id*.)  He asserts, "I'm trying to be honest with myself [regarding] what the causes were

20    [of the crimes] so I've engaged in my own self-realization program and I think that I've been

21    pretty good about it."  (*See id*. at 50.)

22

01          In its decision, the Board recommended that "if available, [petitioner] participate in

02   self-help programming … [although] this is in no way a mandate for AA or NA." (*Id*. at 73.)

03   The Board explained that it recommended those two substance abuse programs because at any

04   point in time "NA and AA are readily available in the institution as well as on the outside."

05   (*Id*. at 73-74.)  The Board also reminded petitioner, however, that "[t]here are other self-

06   programs that come and go, depending on budget issues and things like that," and petitioner

07   should take advantage of those programs when they are available.  (*See id*. at 73.)  The Board

08   concluded that "we need to be as sure as humanly possible that [your drug and alcohol abuse]

09   is not going to come up again … you have to be able to assure the board that your plan is in

10   place and that you have a fall back system."  (*See id*. at 74.)  Because the Board could

11   reasonably conclude that petitioner's own assessment that he has engaged in sufficient self-

12   reflection to prevent himself from relapsing into drug and alcohol abuse or other criminal

13   behavior is insufficient evidence that he would not pose a present danger to society if released

14   on parole, the Board's finding was supported by "some evidence."

15          The fourth factor relied upon by the Board was petitioner's most recent psychological

16   evaluation, which was prepared by a senior psychologist in December 2005.  (*See id.* at 52

17   and 71.)  The Board noted that following three negative psychological evaluations in 1987,

18   1990, and 1992, petitioner declined to participate in future evaluations until December 2005.

19   (*See id*. at 53-54.)  The 2005 psychological evaluation also recommended against petitioner's

20   release on parole.  (*See id*. at 71.)  Specifically, the 2005 report described petitioner's daily

21   habit of abusing alcohol, cocaine, and opiates prior to his incarceration, and asserted that

22   petitioner's "significant risk factors or precursors to violence … include history of substance

01  abuse, lack of insight into factors leading to the life crime and lack of genuine remorse for the

02  victims." (*Id*. at 54.)  As a result, the psychologist concluded that petitioner "needs to pursue

03  the additional self-help programming which is essential to his adjustment and needs additional

04  time to gain such programming." (*Id*. at 73.)

05          During the hearing, the panel acknowledged petitioner's argument that his December

06  2005 interview lasted only 45 minutes, which petitioner felt was an insufficient period of

07  time.  (*See id*. at 52-53.)  Although the Board asserted that it developed a greater

08  "understanding of the inmate's level of remorse and insight [through] our conversation"

09  during the hearing, it concluded that the 2005 psychological evaluation was still a factor

10  weighing against a finding of suitability.  (*See id*. at 71.)  Especially in light of the fact that all

11  of petitioner's psychological evaluations during his two decades of incarceration have

12  recommended against a finding of suitability for parole, petitioner's 2005 psychological

13  evaluation provided  "some evidence" to support the Board's conclusion.

14          Finally, the Board considered the Orange County District Attorney's statement of

15  opposition to petitioner's parole.  (*See id*. at 72.)  Pursuant to California Penal Code

16  Regulation § 3041.7, a prosecutor may attend a parole hearing to represent "the interests of

17  the people."  In the absence of other reliable evidence of unsuitability in the record,

18  opposition by law enforcement based upon the nature of the commitment offense does not

19  constitute "some evidence" to support parole denial.  *See Rosenkrantz v. Marshall,* 444 F.

20  Supp. 2d 1063, 1080 n.14 (C.D. Cal. 2006) (providing that where a district attorney and

21  sheriff's department opposed parole based solely upon the gravity of the commitment offense,

22  their opposition did not constitute "some evidence" because it was "merely cumulative" of the

01 Board's findings regarding the offense).  Because the Board relied upon other reliable

02 evidence of petitioner's unsuitability for parole, however, its additional consideration of law

03 enforcement's opposition was not arbitrary and capricious.  *See id.*

04       Contrary to petitioner's argument that the Board failed to consider or give appropriate

05 weight to the parole suitability rules which favored petitioner, the Board acknowledged that

06 petitioner "does not have a juvenile record, does not have an adult record [or] a record of

07 violence or any arrests or convictions." (*See* Dkt. 1, Ex. B at 23, 25 and 70.)  The Board

08 noted that petitioner has "numerous offers of residential plans [as well as] acceptable

09 employment plans either as a dental technician in the dental field, not as a dentist, and also in

10 the legal field as evidenced by numerous letters of offers of employment as well as

11 residence…." (*See id.* at 71.)  The Board also commended petitioner for being discipline free

12 for 19 years, and for his "work in the dental lab as well as other numerous laudatory

13 chromos." (*See id.* at 72.)

14       It is therefore an inaccurate characterization of the record to say that the Board failed

15 to provide petitioner with an "individualized consideration of all relevant factors." (*See* Dkt.

16 1 at 25.)  As mentioned above, the Board has broad discretion to determine how suitability

17 and unsuitability factors interrelate to support its conclusion of current dangerousness to the

18 public.  *See Lawrence*, 44 Cal.4th at 1212.  Despite petitioner's recent gains, the Board

19 determined that he remains an unreasonable risk of danger to society if released on parole,

20 and these findings were supported by "some evidence" in the record.  (*See id.*, Ex. B at 69 and

21 72.)

22

01          C.      *Petitioner's "Vagueness" Claim Regarding "the* Dannenberg *Standard"*

02          Petitioner contends that "the *Dannenberg* standard, 'that the violence or viciousness of

03   the inmate's crime must be more than minimally necessary to convict him of the offense for

04   which he is confined,' is unconstitutionally vague because there is no set of 'minimally

05   necessary circumstances' set forth in the law, [the standard] is unreviewable, and can be

06   arbitrarily and capriciously applied to every murder." (*See* Dkt. 1 at 46-50.)  *See also In re*

07   *Dannenberg*, 34 Cal.4th 1061, 1071 (2005) (providing that "the Board must point to factors

08   beyond the minimum elements of the crime for which the inmate was committed" to deny a

09   parole date).  Petitioner asserts that his Fourteenth Amendment due process rights were

10   violated when "the *Dannenberg* standard" was applied to his case, because it "allowed the

11   Board to arbitrarily and capriciously apply § 2402(c)(1)(A) [multiple victims] and

12   § 2402(c)(1)(D) [exceptionally callous disregard for human suffering] to petitioner's case

13   based entirely on their subjective personal opinions to deny parole." (*See id*. at 50.)  Thus,

14   petitioner argues "the *Dannenberg* standard" is unconstitutionally vague on its face, and as

15   applied to him.  (*See id*. at 46.)

16          Since the Orange County Superior Court issued its decision denying petitioner's

17   request for habeas relief, the California Supreme Court clarified its holding in *Dannenberg*.

18   Specifically, the California Supreme Court explained in *Lawrence* that the relevant inquiry is

19   no longer whether "the circumstances of the offense exhibit viciousness above the minimum

20   elements required for conviction of that offense … [but] whether the circumstances of the

21   commitment offense, when considered in light of the other facts in the record, are such that

22   they continue to be predictive of current dangerousness many years after commission of the

REPORT AND RECOMMENDATION -20

01  offense." *See Lawrence*, 44 Cal.4th at 1221.  During petitioner's 2006 hearing, the Board

02  clearly found that petitioner's commitment offenses continued to be predictive of his current

03  dangerousness based on the suitability and unsuitability factors as discussed *supra* in section

04  VI, subsection B.  (*See* Dkt. 1, Ex. B at 69.)  Even though the Orange County Superior Court

05  applied "the *Dannenberg* standard" and held that petitioner's level of disregard for human

06  suffering exceeded the minimum elements of a second degree murder offense, its conclusion

07  was correct.  (*See* Dkt. 10, Ex. 5 at 4.)  The circumstances surrounding the commitment

08  offense, together with the facts in the record, support a finding of current dangerousness.  The

09  United States Supreme Court has long held that where a trial court's decision is correct, it

10  must be upheld upon review, even though the court relied upon the wrong ground.  *See Brown*

11  *v. Allen*, 344 U.S. 443, 458-59 (1953).  Accordingly, petitioner's contentions are unavailing.

12        D.      *Petitioner's "Vagueness" Claim Regarding Section 2402(c)(1)*

13        Petitioner contends that section 2402(c)(1), which contains the "especially heinous,

14  atrocious, or cruel" standard, is unconstitutionally vague on its face and as applied to his case.

15  (*See* Dkt. 1 at 50-55.)  He also claims that subdivisions (A) and (D), which the Board found

16  applied to petitioner's offenses, are unconstitutionally vague.  (*See id*. at 50-51 and 54-55.)

17        Petitioner primarily relies upon the United States Supreme Court decision *Maynard v.*

18  *Cartwright*, 486 U.S. 356 (1988), as support for his assertions.  (*See id*.)  The *Maynard* court

19  asserted that "[v]agueness challenges to statutes not threatening First Amendment interests are

20  examined in light of the facts of the case at hand … [and] judged on an as-applied basis."

21  *Maynard*, 486 U.S. at 361.  The Supreme Court then held that Oklahoma's "aggravating

22  circumstance" statute, which included the language "especially heinous, atrocious, or cruel"

01   and set forth factors rendering a defendant convicted of first degree murder eligible for the

02   death penalty, was unconstitutionally vague. *See id.* at 363-64.  Specifically, the Supreme

03   Court asserted that the Oklahoma statute failed to guide and channel jury discretion, as an

04   ordinary person could believe every unjustified and intentional taking of life was "especially

05   heinous," and the appellate court had failed to apply a limiting construction that would have

06   eliminated the constitutional problem.  *See id.* at 363-65.

07         The Oklahoma "aggravating circumstances" statute at issue in *Maynard* resembled

08   California's "aggravating" or "special circumstance" statute in certain respects.  *See People v.*

09   *Lewis*, 43 Cal.4th 415, 516 fn.27 (2008) (noting that "aggravating circumstances" under

10   Oklahoma's capital scheme are analogous to California's "special circumstances," but holding

11   that California's "lying-in-wait" special circumstance was not unconstitutionally vague);

12   *People v. Superior Court (Engert)*, 31 Cal.3d 797, 801-03 (1982) (holding that section

13   190.2(a)(14) of the California Penal Code, which listed "especially heinous, atrocious or

14   cruel" murders as a "special circumstance," was unconstitutionally vague).  Section

15   2402(c)(1) of title 15 of the California Code of Regulations, however, governs parole

16   suitability determinations, and is part of an entirely distinct regulatory framework than capital

17   punishment schemes like the one at issue in *Maynard*.  Petitioner's attempt at drawing

18   comparisons between these very different laws, simply because both contain the words

19   "especially heinous, atrocious or cruel," is unconvincing.  (*See* Dkt. 1 at 51-53.)

20         Furthermore, California courts recently considered whether section 2402(c)(1) is

21

22

01  unconstitutionally vague in *In re Lewis*, 172 Cal.App.4th 13 (2009).[3]  In *Lewis*, the Santa

02  Clara County Superior Court held evidentiary hearings for three days, and considered expert

03  analysis of 2,690 parole suitability hearing transcripts conducted by the Board during thirteen

04  randomly-selected months between July 31, 2002, and June 30, 2006.  *See Lewis*, 172

05  Cal.App.4th at 17.  At the conclusion of the hearings, the superior court concluded that

06  section 2402(c)(1) was not unconstitutionally vague on its face, because the "factors in

07  subdivisions (A)-(E) provide … clear limiting construction to the term 'especially heinous,

08  atrocious, or cruel'…."  *Id*. at 24.  The superior court found the regulations unconstitutionally

09  vague "as applied," however, because "[i]n every case, the Board had determined at some

10  point in time that every inmates' crime was 'especially heinous, atrocious or cruel' [under

11  section 2402(c)]."  *Id*. at 24.  "[A]n as applied challenge assumes that the statute or ordinance

12  violated is valid and asserts that the manner of enforcement against a particular individual or

13  individuals or the circumstances in which the statute or ordinance is applied is

14  unconstitutional."  *Id*. at 27-28 (*quoting Tobe v. City of Santa Ana*, 9 Cal.4th 1069, 1089

15  (1995)).  The superior court reasoned that because the Board could not have found that 100%

16  of cases involved "especially heinous, atrocious and cruel" offenses, the Board's decision in

17  every hearing which resulted in the denial of parole must not have been based upon the

18  requisite individualized consideration.  *See id*. at 24-25.  As a result, the superior court

19  concluded the Board was applying the regulations arbitrarily, and the regulations were void

20  _____

21  [3] The California Court of Appeal's caption for this case is "In re Donald Ray Lewis, on Habeas Corpus. [And four other cases.]"  The four other case names, which are included in a footnote, are *In re Morris Leon Bragg* (No. H032045, Super.Ct. No. 108543), *In re Viet Mike Ngo* (No. H032046, Super.Ct. No. 127611), *In re*

22  *Donnell Eugene Jameison* (No. H032047, Super.Ct. No. 71194), and *In re Arthur S. Criscione* (No. H032048, Super.Ct. No. 71614).

01  for vagueness.  *Id*. at 25.

02        On appeal, the California Court of Appeal reversed, citing the lower court's failure to

03  construe the applicable regulations as a whole.  *See id*. at 27-28.  Specifically, the Court of

04  Appeal asserted that "[i]f the Board's analysis of an inmate's parole suitability depended

05  solely upon a finding that the inmate's commitment offense was 'especially heinous, atrocious

06  or cruel' and the Board routinely made such a finding, this would present compelling

07  evidence that the Board was undertaking a formulaic application of the parole suitability

08  regulations in violation of inmates' due process rights."  *Id*. at 29.  The applicable regulations,

09  however, "direct the Board to consider many factors before determining whether or not a

10  particular inmate is suitable for parole – whether or not the commitment offense was or was

11  not 'especially heinous, atrocious or cruel' is but one of those factors."  *Id*.  Because the

12  relevant determination for the Board is whether, based upon an evaluation of each of the

13  statutory factors, an inmate remains a danger to public safety, "the Board's findings that

14  certain suitability or unsuitability factors, e.g., whether or not the commitment offense was

15  'exceptionally heinous, atrocious, or cruel,' exist in a particular case are secondary to the

16  Board's analysis and explanation of how those factors combine to support its ultimate

17  decision to either grant or deny parole to a particular inmate."  *Id.* at 28.  *See also Lawrence*,

18  44 Cal.4th at 1227.  Thus, the California Court of Appeal concluded that in order to review an

19  "as applied" challenge, a court must "[review] the Board's decision … [to determine] whether

20  or not the Board's conclusion that a particular inmate poses a current danger to society is

21  supported by the Board's analysis of the various unsuitability and suitability factors…."

22  *Lewis*, 172 Cal.App.4th at 29.  The "salient question" is whether the Board "fail[ed] to

01    demonstrate how all the applicable regulatory factors interrelate to supports its conclusion that

02    the inmate is currently dangerous to society?"  *Id.* at 29.

03         Application of the California Court of Appeal's decision in *Lewis* to petitioner's case

04    reveals that his vagueness challenges are unavailing.  California courts have found that

05    section 2402(c)(1) survives a facial challenge for unconstitutional vagueness because the

06    "factors in subdivisions (A)-(E) provide … clear limiting construction to the term 'especially

07    heinous, atrocious, or cruel'…."  *Id.* at 24.  Petitioner also fails to cite any authority that

08    supports his claim that subdivisions (A) and (D), which reference the existence of multiple

09    victims and an offense "carried out in a manner which demonstrates an exceptionally callous

10    disregard for human suffering," are unconstitutionally vague.  (*See* Dkt. 1 at 54-55.)  In

11    addition, petitioner's claim that section 2402(c)(1) is unconstitutionally vague "as applied" to

12    his case lacks merit, because the Board did not "fail to demonstrate how all the applicable

13    regulatory factors interrelate to supports its conclusion that the inmate is currently dangerous

14    to society" during his 2006 hearing.  *Lewis*, 172 Cal.App.4th at 29.  The Board analyzed

15    multiple suitability and unsuitability factors on the record, and relied upon petitioner's three

16    commitment offenses, unstable social history, insufficient participation in self-help

17    programming, unfavorable psychological evaluation, and opposition by law enforcement to

18    find petitioner unsuitable for parole because the "positive aspects of [petitioner's] behavior do

19    not outweigh the factors [of] unsuitability…."  (*See* Dkt. 1, Ex. B at 69-72.)  Accordingly,

20    petitioner failed to meet his burden of demonstrating that section 2402(c)(1) was

21    unconstitutionally vague, either on its face or as applied.

22

01      E.      *Petitioner's First and Fourteenth Amendment Claim*

02          With respect to petitioner's First and Fourteenth Amendment claim, this Court agrees

03   with the reasoning set forth by the Orange County Superior Court in its Order.  (*See* Dkt. 10,

04   Ex. 5 at 4.)  The Board did not mandate petitioner's participation in AA or NA.  (See Dkt. ,

05   Ex. B at 73.)  Rather, the Board indicated that petitioner should take advantage of the other

06   types of self-help or substance abuse programs which become available in Folsom State

07   Prison, and put some kind of drug relapse prevention plan in place because of his long history

08   of drug abuse.  (*See id*. at 73-75.)  Finally, petitioner's First Amendment claim, even if

09   meritorious, would not affect this Court's consideration of his habeas petition because

10   petitioner's insufficient self-help programming was only one of several sufficient reasons

11   given by the Board to support its unsuitability finding.  (*See id*. at 69-75; Dkt. 10, Ex. 5 at 4.)

12      VII.    CONCLUSION

13          As stated above, it is beyond the authority of a federal habeas court to determine

14   whether evidence of suitability outweighs the circumstances of the commitment offense,

15   together with any other reliable evidence of unsuitability for parole.  The Board has broad

16   discretion to determine how suitability and unsuitability factors interrelate to support its

17   conclusion of current dangerousness to the public.  *See Lawrence*, 44 Cal.4th at 1212.

18   Although the Board praised petitioner's good behavior and progress in prison, it determined

19   that petitioner remains an unreasonable risk of danger to society if released on parole.

20   Because the state court decision upholding the Board's findings satisfies the "some evidence"

21   standard, there is no need to reach respondent's argument that another standard applies.

22

01     Given the totality of the Board's findings, there is "some evidence" that petitioner

02 currently poses a threat to public safety, and the Orange County Superior Court's Order

03 upholding the Board's decision was not contrary to, or an unreasonable application of, clearly

04 established federal law, or based on an unreasonable determination of facts.  I therefore

05 recommend that the Court find that petitioner's due process rights were not violated, and that

06 it deny his petition and dismiss this action with prejudice.

07     This Report and Recommendation is submitted to the United States District Judge

08 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days

09 after being served with this Report and Recommendation, any party may file written

10 objections with this Court and serve a copy on all parties.  Such a document should be

11 captioned "Objections to Magistrate Judge's Report and Recommendation."  Failure to file

12 objections within the specified time may waive the right to appeal the District Court's Order.

13 *See Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  A proposed order accompanies this

14 Report and Recommendation.

15     DATED this 30th day of July, 2009.

16

17

18     JOHN L. WEINBERG
         United States Magistrate Judge

19

20

21

22

REPORT AND RECOMMENDATION -27